UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

RACHEL DUNCANSON,

    Debtor

_____

Rachel Duncanson,

    Plaintiff

vs.

Bank of North Dakota,
United States Department of Education,

    Defendants

Chapter 7

Bankruptcy No. 20-00884

Adversary No. 20-09045

# OPINION AND ORDER ON THE DISCHARGABILITY OF DEBTOR'S STUDENT LOANS

In this adversary proceeding, Debtor-Plaintiff seeks to determine the dischargeability of her educational loans. The Court held a trial and a follow-up evidentiary hearing. Wilford L. Forker appeared for Debtor-Plaintiff, C. Anthony Crnic for the Bank of North Dakota ("Bank"), and Martin McLaughlin for the United States Department of Education ("DOE"). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## I. BACKGROUND

Rachel Duncanson ("Debtor") filed her Chapter 7 bankruptcy petition on July 14, 2020. She filed this adversary proceeding on September 18, 2020, to determine the dischargeability of her two student loans—one with the DOE and one with the Bank. Each of these loans are a consolidation of multiple student loans. The DOE loan represents her time at Iowa State University where she earned a Bachelor of Arts degree (B.A.) in physics, education, and communication in 2000. The Bank loan represents her time at South Dakota State University where she earned a Bachelor of Science degree (B.S.) in mechanical engineering in 2010. As of October 21, 2020, Debtor owed DOE $108.073.54 and the Bank $96,074.39. These amounts have increased significantly with interest added, but no current amount is in the record.

The case was stayed before trial to explore whether Debtor qualified for DOE plans that might help resolve the repayment issues. Eventually the parties concluded they did not work for her situation. The case proceeded to trial. Debtor argues that she is living paycheck to paycheck and is unable to pay off the student loan debt without "undue hardship." She asserts that paying off her loans will produce emotional harm and prevent her from retiring given her few assets, speculative future income, and the high cost of living.

The DOE and the Bank argue that the Debtor's education and employment in California indicate she can pay her loans. They point to her ability to pay her Bank loan while making significantly less income as evidence of her ability to pay. This ability to pay is strengthened, according to the DOE, by the availability of an income-based repayment plan ("IBRP") for the DOE loan.

After trial, the parties again requested that the Court defer ruling so the DOE could determine Debtor's eligibility for newly enacted loan forgiveness programs. After a lengthy delay, there was no resolution. The Court requested a supplemental hearing to update the status of Debtor's income and expenses. Debtor testified again at a video-conference hearing and provided the updated information.

For the reasons below, the Court finds that the DOE's loan is not dischargeable while the Bank's loan is dischargeable under 11 U.S.C. § 523(a)(8).

## II. STATEMENT OF FACTS

Debtor is 50 years old. She lives in Visalia, California, 40 minutes from Fresno, California. Debtor is single with no dependents. She works at PB Loader Corporation in Fresno, California, as a design engineer. She makes $78,000 annually at roughly $38 an hour. She lives in a trailer she rents on a chicken farm in Visalia.

Debtor received her first bachelor's degree in physics, education, and communication from Iowa State University in 2000. At Iowa State, she had financial

and mental health issues. She took a year and a half off from school. She eventually earned her degree after seven and a half years.

Debtor then taught high school science in Saint Joseph, Missouri for one year. She was still dealing with mental health issues, so she moved closer to her parents. She taught math and life science in Seymour, Iowa between 2001 and 2004. From 2004 to 2007, Debtor then worked at Cigna Tel-Drug in Sioux Falls, South Dakota and consolidated her DOE loans into a single loan. In 2007, Debtor enrolled at South Dakota State University to pursue a bachelor's degree in mechanical engineering. She borrowed money from the Bank. While at South Dakota State, Debtor's DOE loan went into deferment.

In 2010, she graduated with her mechanical engineering degree. She was hired as a night shift supervisor at POET Ethanol in Bingham Lake, Minnesota. Following an ethanol spill at the plant sometime in 2011 or 2012, her position was terminated through no fault of her own. She moved back home with her parents in Sheldon, Iowa. For the next six years, Debtor searched for jobs that would utilize her degrees. She had no success. She instead worked delivering newspapers and intermittently as a yoga instructor. Debtor continued to battle mental health issues and had some physical health issues as well. She underwent a successful gastric bypass surgery in 2014 that saw the Debtor lose 200 pounds. During this six-plus year period, Debtor made little income with salaries ranging from $4,000 to $13,000 annually.

4

In 2018, she worked briefly at Rock Industries in Rock Valley, Iowa. She then took a job at Maintainer in Sheldon, Iowa, as a design engineer—a position that utilized her degrees. Debtor was demoted to designer after one year due to difficulties with her male supervisor. Debtor worked as a designer for another two years, earning around $42,000 annually.

In March 2020, Debtor consolidated her Bank loans into a single loan, which removed her parents as co-signers and decreased her interest rate from 6.5—8.32% to 4%. Before consolidation, Debtor consistently made payments to the Bank. She had made over 100 payments. Meanwhile, Debtor has made only inconsistent payments totaling about $1,300 on her DOE loan. After consolidation, Debtor only made one payment to the Bank. She made no further payments to the DOE.

Debtor filed for bankruptcy in 2020. In May 2022, Debtor moved to California to be closer to her sister and niece. She took a job as a mechanical design engineer at MAF Industries in Traver, California. This position was her highest paying job, with an annual income of $85,000. She incurred $17,000 in moving expenses to get from Iowa to California. In California, she rented an apartment for $2,000 per month beginning May 2022. After only working at MAF for a few

months, she was terminated.  The reason for termination is disputed.[1]  Debtor was unemployed for five weeks.  She then obtained a new job at a lower rate of pay.

This was the state of the record after trial.  After the lengthy stay to explore resolution with the DOE, which was ultimately unsuccessful, the Court asked for updated evidence on income and expenses.  Debtor testified by video on March 8, 2024.  She has a new job at PB Loader Corporation located in Fresno, California.  She is earning an annual salary of $78,000 working as a design engineer.  Debtor moved out of the apartment she rented for $2,000 per month.  She moved to Visalia, California, where she pays $1,000 monthly to rent a trailer on a chicken farm.

### III.   CONCLUSIONS OF LAW AND DISCUSSION

Section 523 of the Bankruptcy Code states:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –

. . .

(8) *unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents*, for –

    (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

    (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

---

[1] Debtor testified at her October 2022 hearing that she was told the reason for her termination was poor performance. According to the Debtor, however, both her boss and HR wanted to keep her.  Additionally, Debtor alleges the real reason for termination was to cut costs—pointing to the fact that her position was advertised for only $65,000 following her termination.

>   (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual . . . .

11 U.S.C. § 523(a)(8) (emphasis added). In short, student loans are nondischargeable in bankruptcy unless debtor proves by a preponderance of the evidence that repayment would impose an "undue hardship." In re Cumberworth, 347 B.R. 652, 657 (B.A.P. 8th Cir. 2006). "Undue hardship" is not defined in the Bankruptcy Code. The Eighth Circuit Court of Appeals has adopted a "totality of the circumstances" analysis to determine undue hardship. See In re Long, 322 F.3d 549, 553–55 (8th Cir. 2003) (reaffirming the "totality of the circumstances" approach to student loan discharge articulated in In re Andrews, 661 F.2d 702 (8th Cir. 1981)).[2] To help make this "totality of the circumstances" determination, bankruptcy courts "should consider: (1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and [their] dependent's reasonable necessary living expenses; and (3) **any other relevant facts and circumstances**

---

[2] A majority of circuits follow the Brunner test when evaluating an action to discharge student loans under 11 U.S.C. § 523(a)(8). See generally Brunner v. New York State Higher Educ. Serv. Corp., 831 F.2d 395 (2d Cir. 1987) (requiring the debtor to make a three-part showing in order to prove undue hardship: (1) that the debtor cannot maintain, based on current income and expenses, a "minimal standard" of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.) The Eighth Circuit, however, has squarely rejected the Brunner Test's stringent requirements for the "less restrictive" totality of the circumstances approach. See In re Long, 322 F.3d at 554 ("We are convinced that requiring our bankruptcy courts to adhere to the strict parameters of a particular test would diminish the inherent discretion contained in § 523(a)(8)(B)."). This Court is bound by the Eighth Circuit's precedent here.

surrounding each particular bankruptcy case." In re Long, 322 F.3d at 554. Debtor bears the burden of proving undue hardship under this test by a preponderance of the evidence. In re Fern, 553 B.R. 362, 367 (Bankr. N.D. Iowa 2016), aff'd 563 B.R. 1 (B.A.P. 8th Cir. 2017). The Court will consider each factor of the test in turn.

### A. Debtor's Past, Present, and Reasonably Reliable Future Financial Resources

To evaluate a debtor's past, present, and reasonably reliable future financial resources, courts should consider current income, income potential from her line of work or career, the potential for advancement, work experience, any gaps in work history, and any other financial holdings debtor may draw upon to pay down the student loans including tax refunds. See In re Long, 322 F.3d at 555 (citing In re Andresen, 232 B.R. 127 (B.A.P. 8th Cir. 1999)). Debtor has had an unconventional school and work history. She has worked in jobs that do not utilize her educational background to make ends meet and pay towards her student loan debt. Despite numerous difficulties, her income prospects have increased over the years from $23,000 annually as a teacher to $78,000 that she earns in her current employment.

Debtor's potential future earnings and other resources to pay back her student loan debt are limited. She has limited prospects of an inheritance. The only possibility is the value of her parents' home—$150,000 to $200,000—to be split six ways with her siblings. Currently, she is making $78,000 a year. The record shows a likelihood that she will continue to work and make an income commensurate with

her education and experience.  See, e.g, In re Conway, 495 B.R. 416, 422 (B.A.P. 8th Cir. 2013) (explaining that the court "will not substitute assumptions or speculation for reasonably reliable facts" such as "earning history, lack of disposable income, and inability to land a higher paying job despite diligent efforts.").

The Court also looks at her age and remaining years in the workforce to help measure financial resources available to pay the loans.  See, e.g., In re Martin, 584 B.R. 886, 892 (Bankr. N.D. Iowa 2018) (discussing the debtor's 50 years of age and finding that, in conjunction with debtor's inability to find consistent work in her field, it was "unlikely she [would] obtain employment sufficient to make payments on her student loan.").  Debtor is now in her 50s.  She hopes to work until she is 70 but is concerned about physical demands of the job—such as interacting with a laser table for cutting sheet metal.  She currently has only $2,500 in retirement savings.  All previous 401(k) accounts have been used up to cover living expenses in her employment gaps.  She intends to rely on social security in her retirement.  Based on all the above, the Court finds that Debtor's past, present, and reasonably reliable future financial resources are limited.

**B. Debtor's Reasonable Necessary Living Expenses**

In looking at Debtor's reasonable and necessary living expenses, Debtor must be allowed a minimal standard of living.  In re Martin, 584 B.R. at 893 (citing In re Abney, 540 B.R. 681, 686 (Bankr. W.D. Mo. 2015)).  If a debtor has unreasonable or

9

unnecessary expenses, this weighs against discharge of student loan debt. Id. "A minimal standard of living requires that the debtor have sufficient financial resources to satisfy needs for food, shelter, clothing and medical treatment." Id. (internal quotation marks omitted). "To be reasonable and necessary, an expense must be 'modest and commensurate with the debtor's resources.'" In re Jesperson, 571 F.3d 775, 780 (8th Cir. 2009) (quoting In re DeBrower, 387 B.R. 587, 590 (Bankr. N.D. Iowa 2008)). The Court "may not engage in speculation when determining net income and reasonable and necessary living expenses." In re Jesperson, 571 F.3d at 780 (citing In re Rose, 324 B.R. 709, 712 (B.A.P. 8th Cir. 2005)). "[F]airness and equity require each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy." In re Long, 322 F.3d at 554. Here, the Court considers Debtor's expenses in light of Debtor's overall financial and interpersonal context.

Debtor currently pays $1,000 in rent, $408 per month to lease her car, $300 for fuel for her car, $422 for electricity/utilities, $155 for telephone/internet, $545 in food costs, $100 for clothing, $200 for personal care, $225 for medical and dental costs, $100 for entertainment, $50 for charity, $300 for her moving debt, and $120 for car insurance. In total, Debtor's monthly claimed expenses total $3,925.

The Court finds that Debtor's expenses are reasonable and necessary to maintain a minimal standard of living. This conclusion is strengthened when

10

considering the unique facts and circumstances of this case. For example, Debtor's elevated personal care, medical, and food expenses are necessary give her prior surgeries, her necessary medications, and special dietary needs. Further, "[w]here one expense might toe the line of 'necessary and reasonable,' frugality in other areas is also relevant to the analysis." In re Haugen, 645 B.R. 635, 650–51 (Bankr. D. N.D. 2022). "Provided that total expenses remain minimal, the debtor is not expected or required to implement every conceivable cost-saving measure." In re Swafford, 604 B.R. 46, 52 (Bankr. N.D. Iowa 2019) (quoting In re Limkemann, 314 B.R. 190, 195 (Bankr. N.D. Iowa 2004)). Debtor has lived frugally and is currently living in a trailer on a chicken farm. The Court finds the existing expenses are necessary and reasonable for this Debtor.

Debtor has included in her expenses, the significant amount of money she paid for her move to California. Debtor testified that the move was quoted at $5-6,000 but ended up costing closer to $17,000. She paid part of it with a credit card. She pays $300 a month towards her credit card. She still owes her sister another $7,000. The DOE and Bank have suggested these expenses were high and should not be considered. The Court concludes that the expenses for the move are on the high end but are not unreasonable. Debtor already had the company moving her belongings across the country when they dramatically increased the cost. Maybe she could have fought the increased charge or found a cheaper way to do the move. However, this

cost is not unreasonable given her circumstances. She was making a move across the country for the first time, trying to improve her salary. She struggled with mental and physical issues, so she needed help to make the move. There is nothing in the record to show that she was careless or frivolous in arranging the move. At most, the record shows she was taken advantage of or treated unfairly by the movers.

Taken altogether, Debtor's necessary and reasonable monthly costs total $3,925. Based on an annual salary of $78,000—roughly $59,042 after taxes in California, or about $4,920 per month—Debtor is left with $995 in discretionary income per month. The Court's calculation of Debtor's reasonable and necessary living expenses weighs against discharge of both loans but supports discharge of at least one.

### C. Other Relevant Facts and Circumstances

The final consideration for the Court is to take account of all other relevant facts and circumstances that could impact a debtor's ability to pay back their student loans. The Court finds there are several additional factors here.

The Court believes Debtor has shown a significant concern about her lack of sufficient funding for retirement. She is in her 50s and has a limited work-life ahead from which to fund retirement. She is in a position of needing to "catch up" on this funding. Her budget does not reflect money for this. The $995 of discretionary

income noted above must be reduced significantly to account for this need. Thus, her monthly discretionary income would be closer to $300-$400.

> One of the financial obligations of a responsible adult is to make reasonable provisions for the future, both for the adult's own good and for the good of his or her family. In measuring what a person reasonably needs in order to maintain a minimal standard of living I believe it is proper to allow modest 401(k) contributions to be made. Requiring a debtor to forego making reasonable provisions for his and his family's future living expenses would itself be an "undue hardship," even if it would not immediately deprive the debtor of food or shelter.

In re Clavell, 611 B.R. 504, 521 (Bankr. S.D.N.Y. 2020); see also In re Marcotte, 455 B.R. 460, 469–70 (Bankr. D.S.C. 2011) (noting that retirement contributions may be justified in certain factual circumstances even under the more stringent Brunner test); In re Craig, 579 F.3d 1040, 1046 (9th Cir. 2009) (explaining that there is no "per se" rule that retirement contributions are automatically unreasonable and remanding to the bankruptcy court for a more factual analysis); In re McDowell, 549 B.R. 744, 767 n.33 (Bankr. D. Idaho 2016) (finding that the debtor's modest contributions to her retirement fund reasonable under the circumstances where she was a single mother of two dependents); In re Allen, 329 B.R. 544, 551–52, n.3 (Bankr. W.D. Pa. 2005) (finding that debtor's payroll deduction for retirement contributions was reasonable and necessary "where a debtor is fairly close to retirement, has not thus far saved anything for retirement, and is not likely to improve his or her earnings ability such that he or she could otherwise save for retirement").

Debtor also continues to struggle with her mental health. She has spent the time, effort, and money on mental health treatments that seem to be effective for her. She has had consistent counseling since she was 30 years old. She believes that her successful weight loss after her 2014 gastric bypass surgery was due to her mental health counseling that continued throughout that trying procedure and recovery time. Her mental health struggles have also impacted her ability to perform in the workplace previously. Thus, she emphasizes the importance of maintaining a good counseling relationship. Based on her history, the Court finds that her mental health concerns must be a consideration here and may put additional pressure on her budget—either directly through medical costs or indirectly through workplace impacts.

### 1. *Availability of an Income-Based Repayment Plan*

The Court also must consider the availability of an income-based repayment plan ("IBRP"). The availability of an IBRP is not determinative as to undue hardship, but is it is an important consideration in the Eighth Circuit. In re Nielsen, 473 B.R. 755, 761 (B.A.P. 8th Cir. 2012), aff'd 502 F. App'x 634 (8th Cir. 2013). "When considering income-based repayment plans under § 523(a)(8), the Court must 'be mindful of both the likelihood of a debtor making significant payment under the [IBRP], and also of the additional hardships which may be imposed by these programs.'" Fern, 553 B.R. at 369 (quoting Abney, 540 B.R. at 689).

"Additional hardships" include the likely growth of the debt over the course of the IBRP, the effect of the debt on the debtor's ability to obtain credit in the future, the mental and emotional impact on the debtor of allowing debt to continue to mount, and the likely tax consequences to the debtor when the debt is ultimately canceled. Fern, 553 B.R. at 369. The tax consequences of an IBRP can be a consideration in favor of discharge. See In re Martin, 584 B.R. at 894–95 (discussing the Fern case while considering the tax consequences of an IBRP and ultimately finding that discharge was appropriate).

Here, when the Court considers the potential tax consequences with Debtor's likelihood of making significant repayments on her loans, the Court must also consider the impact of the DOE's newest plan: Saving on Valuable Education Plan ("SAVE"), which eliminates the accrual of interest if payments are made. If neither of Debtor's student loans was dischargeable here and she was subsequently approved for the SAVE Plan and faithfully paid $200 a month for 20 years, she would have only paid $48,000 out of $108,073.54 that she owes the DOE. Not only is that not a significant repayment on her loan, but the amount to be forgiven would effectively double her income for the year, causing a significant tax bill on the eve of her retirement. Considering all the above, the Court finds that the additional hardships of an IBRP on Debtor, by facing a tax bill that could wipe out any meager savings

15

she was able to make towards retirement, paired with the lack of reasonably likely significant payments towards her DOE student loan all weigh in favor of discharge.

**D. Debtor's Good Faith Payments and the Unavailability of Partial Discharge**

Upon weighing all the factors here, the Court finds that not discharging at least one of Debtor's remaining student loans would create an undue hardship on her due to her age, her inconsistent employment history, and her mental health concerns. The Court, however, is faced with a difficult task here. The Eighth Circuit is an "all or nothing" jurisdiction—meaning that the Court does not have the authority to partially discharge portions of either or both the loans at issue here. See In re Conway, 495 B.R. 416, 423 (B.A.P. 8th Cir. 2013) ("[T]here is no case law in this circuit that would authorize the court to 'partially discharge' a student loan."); In re Hawkins, 187 B.R. 294, 300 (Bankr. N.D. Iowa 1995) ("The court's authority under § 523 is to determine dischargeability. This is an all-or-nothing proposition."); In re Faktor, 306 B.R. 256, 262–63 (Bankr. N.D. Iowa 2004) ("The court does not have the authority to modify the payment terms of a student loan or to discharge a partial amount of principal or accrued interest.").[3] However, "[t]he Court must determine

---

[3] Some Circuits have allowed partial discharge under § 523(a)(8). See e.g., In re Carnduff, 367 B.R. 120, 130 (B.A.P. 9th Cir. 2007) ("The Ninth Circuit has rejected the view that Section 523(a)(8) mandates an 'all-or-nothing' approach to nondischargeability of student loan debt."); see also In re Hagen, 36 B.R. 578, 579 (Bankr. M.D. Fla. 1983); In re Kuhns, 33 B.R. 759, 762–63 (Bankr. S.D. Ohio 1983). Interpreting § 523(a)(8) to allow partial discharge is arguably the more equitable approach. See Thad Collins, Note, *Forging Middle Ground: Revision of Student Loan Debts in Bankruptcy as an Impetus to Amend 11 U.S.C. § 523(a)(8)*, 75 IOWA L. REV. 733, 753–57

whether each loan, separately, imposes an undue hardship and may discharge some loans while declining to discharge others." In re Martin, 584 B.R. 886, 890–91 (Bankr. N.D. Iowa 2018).

Based on the Court's finding that not discharging some of Debtor's student loans would impose an undue hardship upon her, the Court must determine which loan to discharge—the Bank's or the DOE's. In making this determination, the Court's final fact it considers is Debtor's good faith payments she made prior to her bankruptcy filing. Debtor consistently paid towards the Bank's loan since her graduation in 2010 until her loan consolidation in March 2020, shortly before her bankruptcy filing in July 2020. In contrast, Debtor has only paid approximately $1,300 towards her DOE loans since 2000. The Court finds that the Debtor's loan with the Bank must be discharged to avoid undue hardship on the Debtor. This discharge will allow her to put her available funds towards her DOE loan, thus avoiding the prohibitive tax consequences of potential loan forgiveness on the eve of retirement. The Court also favors the DOE loan in this case because the SAVE Plan that is available to Debtor would keep interest on the loan principal from accruing as long as she makes consistent payments. In contrast, the Bank's loan interest has almost doubled her principal amount even with her consistent payments

---

(1990). But there is little support for the proposition that Congress intended § 523(a)(8) to allow for partial discharge. Id. at 757–63. Further, this Court is bound by Eighth Circuit precedent on the topic.

17

over the years—a prohibitive trend that would continue into Debtor's retirement if the DOE loan were discharged instead. The Court notes that if Debtor faithfully pays even $750 of her discretionary incomes towards her DOE loan, she will have paid the DOE loan of $108,073.54 *in full* in approximately 12 years. This scenario will require Debtor to continue to fulfill her student loan obligations to the extent that she is able while avoiding the significant tax consequences of a potential loan forgiveness and allowing her to save for retirement.

### IV. CONCLUSION/ORDER

For all the foregoing reasons, Debtor's loan from the Bank is dischargeable under 11 U.S.C. § 523(a)(8). Debtor's loan from the DOE is not dischargeable under 11 U.S. C. § 523(a)(8). A judgment shall be entered accordingly.

Ordered: July 19, 2024

Thad J. Collins
Chief Bankruptcy Judge